**EXHIBIT C**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Administration for Children and Families, Region III

Suite 864
150 S. Independence Mall West
Philadelphia, PA 19106-3499

November 3, 2005

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Mr. Frank Ogundare
Board President
Southern Delaware Center for Children and Families
18907 Unit 4 Maranatha Way
Bridgeville, Delaware 19933

Re: Grant No. 03CH0016/23

Dear Mr. Ogundare:

This letter is official notification to Southern Delaware Center for Children and Families ("Southern Delaware" or "grantee") that, pursuant to Section 641A(d) of the Head Start Act, as amended, 42 U.S.C. § 9836a(d), and 45 C.F.R. §§ 1303.14(b)(3), (b)(4), (b)(7) and (b)(9), Southern Delaware's designation as a Head Start grantee is terminated.

Following a comprehensive on-site monitoring review of the grantee conducted from March 15 through 19, 2004 using the Program Review Instrument for Systems Monitoring of Head Start grantees (PRISM), which fully incorporates all of the Head Start requirements, the Administration for Children and Families (ACF) identified deficiencies in the operation of Southern Delaware's Head Start program. By letter dated May 5, 2004, which transmitted the results of the on-site review, ACF advised Southern Delaware that ACF had identified the Head Start program as deficient in operation. ACF specifically advised the grantee that its Head Start program had deficiencies related to Planning, Record-keeping and Reporting, and Ongoing Monitoring. The letter also advised Southern Delaware that, in addition to the deficiencies identified, ACF found that the grantee's Head Start program had areas of noncompliance relating to Prevention and Early Intervention, Health Care Tracking and Follow-up, Individualization, Disabilities Services, Curriculum and Assessment, Child Outcomes, Program Governance, Self-Assessment, Human Resources, Fiscal Management, Eligibility, Recruitment, Selection, Enrollment and Attendance, and Facilities, Materials, Equipment and Transportation. A detailed discussion of the deficiencies and areas of non-compliance identified is contained in the 2004 Head Start Review Report, which the grantee received on May 7, 2004.

In ACF's May 5, 2004 letter, ACF notified the grantee of its responsibility to correct all deficiencies. ACF advised the grantee that in order to correct the deficiencies in the Head Start program, the grantee was required to develop and submit a Quality Improvement Plan (QIP) addressing the deficiencies identified. ACF further advised the grantee of the requirement for



the QIP to specify the deficiencies to be corrected, the actions to be taken to correct such deficiencies, and the timetable for accomplishment of the corrective actions specified. The letter further notified the grantee that the period of correction under the QIP could not exceed one year from the date that the grantee received notice of the deficiencies. The letter also notified the grantee of the requirement for the QIP to be submitted to the ACF Regional Office within 30 days of receipt of the letter.

ACF's May 5, 2004 letter advised the grantee that areas of non-compliance in Prevention and Early Intervention, Health Care Tracking and Follow-up, Individualization, Disabilities Services, Curriculum and Assessment, Child Outcomes, Program Governance, Self-Assessment, Human Resources, Fiscal Management, Eligibility, Recruitment, Selection, Enrollment and Attendance, and Facilities, Materials, Equipment and Transportation were required to be remedied within 120 days of receipt of the May 5, 2004 letter. ACF advised the grantee that once the areas of noncompliance were remedied, the grantee was required to submit a letter to the ACF Regional office certifying full compliance. ACF notified the grantee that if it was not willing or able to correct those areas of noncompliance within the 120 day time period, the grantee would be judged to have additional deficiencies required to be corrected immediately or pursuant to the QIP.

On June 4, 2004, the grantee timely submitted a QIP which was tentatively approved by ACF on July 2, 2004, pending revisions with respect to document organization and strategy completion dates that were outside of the Quality Improvement Period. On July 23, 2004 the grantee submitted a revised QIP, which was approved by ACF on October 6, 2004 In ACF's October 6, 2004 letter approving the grantee's QIP, ACF advised the grantee that, although the QIP was approved, the responsibility for correction of deficiencies was the exclusive responsibility of the grantee. ACF also advised the grantee of its responsibility to monitor the implementation of the QIP and to make any necessary adjustments.

By letter dated September 23, 2004 the grantee certified that some, but not all, areas of noncompliance had been remedied. The letter also requested an extension of time to October 29, 2004 to remedy the remaining areas of noncompliance.

By letter dated October 28, 2004, ACF notified the grantee that, pursuant to 45 C.F.R. § 1304.61(b), the grantee had been identified as a program with additional deficiencies. ACF advised the grantee that the newly identified deficiencies were the result of the grantee's failure to document that it had remedied areas of noncompliance related to Prevention and Early Intervention, Health Care Tracking and Follow-up, Disabilities Services, Curriculum and Assessment, Child Outcomes, Program Governance, Human Resources, Eligibility, Recruitment, Selection, Enrollment and Attendance, and Facilities, Materials Equipment and Transportation. ACF notified the grantee of the requirement to eliminate the newly identified deficiencies no later than one year from the grantee's receipt of the May 5, 2004 notice letter. ACF's October 28, 2004 letter also notified the grantee of the requirement to submit an amended QIP addressing the newly identified deficiencies.

2

On November 24, 2004 the grantee submitted an amended QIP. However, by letter dated February 8, 2005, ACF advised the grantee that the amended QIP was not approved because it did not identify the new deficiencies to be corrected, and failed to specify dates for correction of each new deficiency. The letter reminded the grantee of the requirement to correct all deficiencies no later than one year from the date the grantee received the initial notification of deficiencies. In addition, ACF's February 8, 2005 letter reminded the grantee that a follow-up review would be conducted from May 16 through 20, 2005 to validate full compliance with Head Start regulations.

By letter dated February 22, 2005 the grantee submitted a revised QIP that included newly identified deficiencies. In ACF's March 5, 2005 letter approving the grantee's revised QIP, ACF once again advised the grantee of the requirement for it to correct all deficiencies no later than one year from the date that the grantee received the initial notification of deficiencies.

From May 15 through 20, 2005 ACF conducted a follow-up review of the grantee's Head Start program which revealed the grantee's failure to correct seven deficiencies identified in the 2004 Head Start Review Report. The seven uncorrected deficiencies are fully described in the enclosed 2005 Head Start Follow-up Review Report.

ACF issues this letter terminating Southern Delaware's Head Start grant pursuant to section 641A(d) of the Head Start Act, as amended, 42 U.S.C. § 9836a(d), and 45 C.F.R. §§ 1303.14(b)(4), (b)(7) and (b)(9). As set forth in detail in the 2005 follow-up report, the grantee failed to correct seven deficiencies identified in the 2004 Head Start Review Report within the time period specified in the grantee's approved QIP, which mandates the grantee's termination under section 641A(d)(1)(C) of the Head Start Act, 42 U.S.C. § 9836a(d)(1)(C) and 45 C.F.R. §§ 1303.14(b)(4) and (b)(7). The seven deficiencies that remain uncorrected relate to Prevention and Early Intervention, Child Outcomes, Record-keeping and Reporting, Ongoing Monitoring, Human Resources, and Facilities, Materials Equipment and Transportation.

ACF also issues this letter terminating Southern Delaware's Head Start grant pursuant to 45 C.F.R. § 1303.14(b)(9) which authorizes termination of a grant when a grantee has failed to abide by any terms or conditions of its award. The grantee's failure to timely correct all deficiencies identified in the 2004 Head Start Review Report constitutes a failure by the grantee to abide by the terms and conditions of its financial assistance award. Additionally, the grantee's failure to 1) timely submit its SF-269 and 2) maintain a financial system that provides for the effective control and accountability for all funds also constitute a failure by the grantee to abide by the terms and conditions of the grant award. Consequently, termination under 45 C.F.R. § 1303.14(b)(9) is proper.

In addition, this letter terminating Southern Delaware's Head Start grant is issued pursuant to 45 C.F.R. § 1303.14(b)(3) which authorizes termination of a grant when a grantee has failed to comply with required fiscal reporting requirements applicable to Head Start grantees. By failing to timely submit its SF-269 in accordance with the regulations at 45 C.F.R. §74.52(a)(iv), the grantee has failed to comply with applicable fiscal reporting requirements. Therefore, termination under 45 C.F.R. § 1303.14(b)(3) is proper.

3

Following is a discussion of each of the grounds for termination. Citations to the specific violations under the Head Start Act and 45 C.F.R. §§ 1303.14(b)(3), (b)(4), (b)(7), (b)(9) are included in the analysis below. Additionally, citations to the location of relevant information contained in the 2004 Head Start Review Report and 2005 Head Start Follow-up Review Report are also included.

I. TERMINATION UNDER SECTION 641A(d) OF THE HEAD START ACT

Pursuant to section 641A(d) of the Head Start Act (Act), ACF must terminate a Head Start grantee's funding when the grantee fails to timely correct a deficiency in meeting performance standards. Section 641A(d)(1)(C), 42 U.S.C. § 9836a(d)(1)(C). Section 641A(d)(2)(A) establishes that a deficiency, other than one that requires correction immediately or within a 90-day period, must be corrected pursuant to an approved Quality Improvement Plan (QIP). Section 641A(d)(2)(A), 42 U.S.C. § 9836a(d)(2)(A). Under section 641A(d)(2)(A)(i)(I-III) and (ii), a deficient grantee must implement a QIP that specifies:

>  (I) the deficiencies to be corrected;
>
>  (II) the actions to be taken to correct such deficiencies; and
>
>  (III) the timetable for accomplishment of the corrective actions specified; and
>
>  (ii) eliminate each deficiency identified, not later than the date for elimination of such deficiency specified in such plan (which shall not be later than 1 year after the date the agency received notice of the determination and of the specific deficiency to be corrected.)

Section 641A(d)(2)(A)(i)(I-III) and (ii), 42 U.S.C. § 9836a(d)(1)(C)(2)(A)(i)(I-III) and (ii).

Notwithstanding the grantee's promises to correct deficiencies in accordance with its approved QIP, seven deficiencies remained uncorrected beyond one year from the date that the grantee received notice of the deficiencies identified and required to be corrected. By failing to eliminate all deficiencies in accordance with its QIP, the grantee violated the Head Start Act. Section 641A(d)(1) of the Head Start Act, 42 U.S.C. § 9836a(d)(1). Accordingly, termination of Southern Delaware's grant under section 641A(d)(1) of the Head Start Act, 42 U.S.C. § 9836a(d)(1), is proper. A discussion of the uncorrected deficiencies is set forth below.

Uncorrected Deficiency 1 Related to Prevention and Early Intervention

Requirement:
*In collaboration with the parents and as quickly as possible, but no later than 90 calendar days (with the exception noted in paragraph (a)(2) of this section) from the child's entry into the program (for the purposes of 45 C.F.R. § 1304.20(a)(1), 45 C.F.R. § 1304.20(a)(2), and 45 C.F.R. § 1304.20(b)(1), "entry" means the first day that Early Head Start or Head Start services*

4

*are provided to the child), grantee and delegate agencies must: (ii) Obtain from a health care professional a determination as to whether the child is up-to-date on a schedule of age appropriate preventive and primary health care which includes medical, dental and mental health. Such a schedule must incorporate the requirements for a schedule of well child care utilized by the Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) program of the Medicaid agency of the State in which they operate, and the latest immunization recommendations issued by the Centers for Disease Control and Prevention, as well as any additional recommendations from the local Health Services Advisory Committee that are based on prevalent community health problems: 45 C.F.R. § 1304.20(a)(1)(ii).*

Findings:
The 2004 Head Start Review Report revealed that the grantee did not insure that all children were up-to-date on a schedule of preventive and primary health care. Specifically, a review of 32 focus children's files showed that 24 children did not have updated immunizations, 11 children had no proof of a dental examination, 9 children had dental exams indicating a need for follow-up and 23 children had dental follow ups that were incomplete. The review report also revealed that 6 children's files contained no Tuberculosis test results, and 32 children's files contained no behavioral screening. The Family Service Coordinator confirmed that the children's records were not current and up-to-date, and that the Family Service Workers and the Health Assistant had not had the opportunity to review the children's files for record completeness.

The 2005 follow-up review revealed that the grantee still had not obtained from a health professional a determination as to whether all children were up-to-date on a schedule of age appropriate preventive and primary health care. A review of 27 focus children's records revealed that two children had not received a hemoglobin or hematocrit test, and five children who did not have up-to-date hemoglobin results. The State of Delaware's EPSDT guidelines indicated that annual hemoglobin testing is required for preschool children considered at risk by their physician. The program's Health Tracker indicated that these children were missing hematocrit and hemoglobin test results, and the Health Coordinator stated that she was aware that these results were missing.

For a detailed discussion of the findings related to this deficiency, please refer to page two of the 2005 Head Start Follow-up Review Report and pages one and two of the of the 2004 Head Start Review Report.

Uncorrected Deficiency 2 Related to Child Outcomes

Requirement:
*Grantees must establish and implement procedures for the ongoing monitoring of their own Early Head Start and Head Start operations, as well as those of each of their delegate agencies, to insure that these operations effectively implement Federal regulations. 45 C.F.R. § 1304.51(i)(2).*

5

Findings:
The 2004 Head Start Review Report revealed that the grantee failed to develop and use an approved plan to measure and utilize child outcomes data. During the review, interviews with content area experts and 12 teachers revealed that staff was not familiar with either the plan or the procedures for outcome measures. The program had selected CCPort as its automated system for outcomes data input, and staff was trained in its use during February 2004. However, at the time of the review, staff was not using the tools available in an effective manner, and the grantee had not aggregated, analyzed or produced a written outcomes report for the program. Further, no plan existed for using outcomes data in either the self assessment or the program planning processes. The review also revealed that a plan presented to Policy Council required extensive revisions related to the tools to be used in measuring child outcomes and the process for developing an outcome measures report three times a year. The grantee's failure to implement the 2001 child outcomes initiative placed the program three years behind national priorities.

The 2005 follow-up review revealed that the grantee had not still not established and implemented procedures for the ongoing monitoring of child outcomes activities. The grantee's child outcomes activities and education monitoring did not document or measure the accomplishments of individuals or small groups of children. Ten teachers interviewed stated that the Center Managers used the Creative Curriculum CCPort computer program to input classroom performance data three times a year, and that computer generated Outcomes Measures Reports had been developed from the Fall 2004 and Winter 2005 data. However, these teachers stated that they did not know how to either use the reports for their particular classrooms or analyze patterns of progress for individuals and small groups of children. The three Center Managers confirmed that teachers did not know how to fully use the data, and did not know how the data should be used to analyze children's progress, trends in the assessment data for curriculum planning, and variances in outcomes measures based on program option, teacher qualification, and center differences. A review of the Center Manager's Classroom Monitoring Tool and monthly reports demonstrated that the grantee failed to focus on this problem during monitoring visits to the classes. As a result, teachers did not understand or recognize the value of outcomes data in evaluating individualization and individual children's progress. The failure to monitor child outcomes activities impeded the grantee's ability to provide meaningful curriculum experiences and prevented the grantee from evaluating the effectiveness of the program's individualization approach, including the methodology for small group assignments and small group activities.

For a detailed discussion of the findings related to this deficiency, please refer to the information on page 12 of the 2005 Head Start Follow-up Review Report and page eight of the 2004 Head Start Review Report.

Uncorrected Deficiency 3 Related to Recordkeeping and reporting

Requirement:
*Grantee and delegate agencies must establish and maintain efficient and effective reporting systems that: (1) Generate periodic reports of financial status and program operations in order to control program quality, maintain program accountability, and advise governing bodies, policy groups and staff of program progress; 45 C.F.R. § 1304.51(h)(1).*

Findings:
The 2004 Head Start review found that the grantee did not generate reports that assisted in maintaining program quality and program accountability. This was evidenced during the review team's observation of the March 17, 2004 Policy Council meeting when questions regarding the accuracy of monthly financial reports were raised in light of the fact that the 12/31/2003 fiscal report had to be revised and re-presented to the Policy Council due to a mathematical error that resulted in an unanticipated carry over balance of $54,216 in the program.

The 2004 review also found that the Center Managers' weekly center inspection list, monitoring records and reports, and staff meeting minutes included little information about the inadequate facilities and classroom materials that were observed in all five locations. In addition, management team and center manager reports for the past year revealed that while various needs and program concerns were identified, the grantee's management failed to always follow through with more than an immediate quick fix response to a crisis. This was evidenced in part by the grantee's failure to find solutions to hiring new teaching staff and the inadequate staffing of classrooms when vacancies occurred. It was also revealed that reports failed to apprise the administrative staff of weaknesses in the delivery of services to children and unmet performance targets.

The 2005 Head Start follow-up review found that the grantee still did not generate reports that assisted in maintaining program quality and program accountability. Specifically, problems related to the accuracy of fiscal reports and the usefulness of programmatic reports continued to exist. During the Policy Council interview, it was revealed that the financial report provided at the December 16, 2004 Policy Council meeting was inaccurate. Inaccuracies in the report included the absence of fiscal expenditures as well as budgeted categories of funds that were included in previous fiscal reports. In addition, minutes from the April 4, 2005 Policy Council meeting indicated that the Policy Council did not receive fiscal reports from December 2004 through March 2005. Likewise, during the Board interview, it was revealed that the Board did not receive fiscal reports during the same time period.

During the Board and Policy Council interviews it was revealed that the format used for fiscal reports did not assist the governing bodies in controlling program quality and maintaining program accountability because the format was too complicated for the members to understand and comprehend. According to the Secretary of the Board/Liaison to the Policy Council, the financial reports would have been more meaningful and useful if a narrative summary was provided as an attachment. Without accurate and timely fiscal data, the Board could not

7

determine how funds were spent, the current fiscal status of the program, and whether the cost principles governing the use of Federal funds were being followed.

The follow-up review also revealed that Monthly Program Progress reports failed to assist the governing bodies in controlling program quality and maintaining program accountability because the reports did not include information regarding performance indicators, the implementation status of content plans or corrective action needed. What's more, the reports failed to include statistical data related to content/program performance. The absence of this data impeded the ability of the governing bodies to analyze the quality of program services provided and maintain program accountability.

For a detailed discussion of the findings related to this deficiency, please refer to the information on pages 18 and 19 the 2005 Head Start Follow-up Review Report and pages 13 and 14 of the 2004 Head Start Review Report.

<u>Uncorrected Deficiency 4 Related to Ongoing Monitoring</u>

<u>Requirement</u>
*Grantees must establish and implement procedures for the ongoing monitoring of their own Early Head Start and Head Start operations, as well as those of each of their delegate agencies, to ensure that these operations effectively implement Federal regulations. 45 C.F.R. § 1304.51(i)(2).*

<u>Findings:</u>
During the 2004 Head Start review it was revealed that the grantee had not established and implemented procedures for the ongoing monitoring of its program operations to ensure that the necessary steps were being taken to meet Federal regulations. While the grantee had in place components that could serve as a framework for a monitoring system, the grantee had not developed a list of program activities and performance indicators requiring monitoring or a detailed monitoring schedule with monitoring duties and timelines clearly identified. Additionally, although interviews with Center Managers and a Family Service Worker revealed that there were some procedures and forms intended for monitoring, there was no written procedure for monitoring that linked record-keeping and reporting to all aspects of programming. The review found that the grantee's existing checklists, monthly meetings, and team meetings did not result in an effective oversight and monitoring system.

During the 2005 follow-up review it was found that the grantee still had not established and implemented procedures for the ongoing monitoring of its operations to ensure that the grantee's operations effectively implemented Federal regulations. The grantee had established a framework for a multi-level monitoring system that included monthly tracking/monitoring forms, monthly content reports and monthly content/service area meetings for communication purposes. However, the grantee had not incorporated these activities and reports into a comprehensive schedule with timeframes, identity of persons responsible, and critical check points for analysis of performance and corrective intervention. A review of monthly content reports and tracking

8

systems revealed that the monitoring framework failed to flag and identify unmet performance indicators, including the program's compliance status with Federal regulations. Based on a review of monitoring reports and monthly progress reports submitted to the governing bodies, the grantee's monitoring framework did not identify effective service implementation in service/content areas.

The Eligibility, Recruitment, Selection, Enrollment and Attendance and Disabilities monitoring systems failed to identify two enrolled children who lived outside the grantee's service area. These children were ineligible for services from the grantee based on the program's approved service area, the western portion of Sussex county. These children were also ineligible for disabilities services from the local LEAs serving the western portion of the county. The children resided in the Laural and Cape Henlopen's LEA service area. Consequently, these children did not receive needed disabilities services. A program referral to the Head Start grantee that served the eastern portion of Sussex county would have provided these children with enrollment and disabilities services.

<u>Uncorrected Deficiency 5 Related to Human Resources</u>

<u>Requirement</u>
*Grantee and delegate agencies must ensure that all staff, consultants, and volunteers abide by the program's standards of conduct. These standards must specify that:*
*(iii) No child will be left alone or unsupervised while under their care. 45 C.F.R. § 1304.52(h)(1)(iii).*

<u>Findings</u>
During the 2004 review it was found that the grantee left children unattended while under the grantee's care. During a site visit to the Stepping Stone Family day Care Home, 17 children were observed on the playground without supervision. This occurred during a transition period when the Head Start children were preparing to leave the program and Kindergarten children were arriving. Also, numerous children were observed unattended in the hallway and restrooms at the Milford and Laverty Lane centers. Center Managers confirmed that children were allowed to go to the bathroom unattended.

On the first day of the 2005 follow-up review, a child was left alone on a Head Start bus parked in the grantee's main office parking lot. This incident occurred after the bus had completed its unloading of afternoon children for the Laverty center, and the bus staff failed to complete a walk through of the bus to ensure that no child was left behind. An investigation by the Director of Services resulted in bus staff's acknowledgment that the incident occurred. Although the Director of Services indicated that this may have been a willful act by staff, she did not indicate that the incident was reported to the local child protection agency for investigation.

For a detailed discussion of the findings related to this deficiency, please refer to the information on pages 23 and 24 of the 2005 Head Start follow-up Review Report and page eight of the 2004 Head Start Review Report.

9

Uncorrected Deficiency 6 Related to Human Resources

Requirement:
*Grantee and delegate agencies must establish and implement a structured approach to staff training and development, attaching academic credit whenever possible. This system should be designed to help build relationships among staff and to assist staff in acquiring or increasing the knowledge and skills needed to fulfill their job responsibilities, in accordance with the requirements of 45 C.F.R. § 1306.23. 45 C.F.R. § 1304.52(k(2).*

Findings:
The 2004 Head Start Review revealed that the grantee had not established and implemented a structured approach to train staff on their roles, responsibilities and Head Start philosophy. A review of the grantee's training calendar and available training documentation (agendas and attendance sheets) showed that the grantee did not generally maintain training documents, thus making it difficult to ascertain exactly what occurred during each training event. Although the review team interviewed several staff members, including the Executive Director, the Education/Disabilities Coordinator, the Family Services Coordinator and 17 teaching staff, no staff member was able to articulate program procedures that would assist them in performing their job. The review also revealed that staff members were unaware of the system for assessing and reporting child outcomes, and the process for referring children with behavioral problems for intervention services. Family Service Workers were unsure of the EPSDT periodicity schedule for children's immunization, and the newly hired classroom staff expressed their needs for training an ongoing support in working with children.

The 2005 follow-up review revealed that the grantee still had not established and implemented a structured approach to staff training designed to assist staff in acquiring or increasing the knowledge needed to fulfill their job responsibilities. Although the grantee made some improvement in this area, staff continued to need training and supervision that would assist them in developing and increasing the needed skills to effectively carryout their job responsibilities. This was confirmed in the grantee's November 2004 self assessment results. The follow-up review found a need for training in all content/service areas. The review specifically found that there was a need for fiscal staff to be trained on the proper use of the GMS system, which would have resulted in its proper use. Additionally, GMS training would have prevented the contamination of fiscal data.

In the area of Child Development and Health Services, additional staff training related to analyzing and using Outcomes Measures data in evaluating the effectiveness of the program's individualization process and curriculum enhancements was needed so that staff could properly perform their job duties.

In the area of Program Design and Management, transportation staff could have benefited from onsite training and practice sessions on the proper use of the Qvest restraint system instead of the limited video training provided. Effective restraint system training would have familiarized staff

10

with the required three point contact points for effective restraint purposes. In addition, training or enrollment eligibility and the grantee's service area as defined in the FAA award would have prevented the enrollment of ineligible children in the program.

Skill focused training for the newly formed management team, coordinators and Center Managers would have assisted staff with understanding the Performance Standards related to Program Design and Management and the use of the community assessment as a decision making and planning tool. This training would also have assisted staff with understanding their role in the program and the relationship between management systems, especially in the areas of planning, ongoing monitoring and ongoing corrective action. Collectively, the managers would have also benefited from skill building training related to planning, critical analysis and problem solving.

For a detailed discussion of the findings related to this deficiency, please refer to the information on pages 25 and 26 of the 2005 Head Start Follow-up Review Report and pages 16 and 17 of the 2004 Head Start Review Report.

Deficiency 7 Related to Facilities, Materials, Equipment, and Transportation

Requirement:
*Grantee and delegate agencies must provide for the maintenance, repair, safety, and security of all Early Head Start and Head Start facilities, materials and equipment. 45 C.F.R. §1304.53.*

Findings:
The 2004 Head Start Review Report revealed that the grantee did not provide adequate maintenance and repairs to indoor and outdoor equipment and facilities. Observation at three Head Start centers and the two family day care homes revealed that equipment was in disrepair and hazardous to children. Nine out of 18 Health and Safety Checklists identified the following: sandboxes in two locations that were uncovered, growing weeds at the Seaford center and the Stepping Stones family day care home, chipped paint in classrooms at Milford and Seaford, broken hard plastic toys with sharp edges, hanging ropes, and splintered wooden climbing structures on a playground at the Stepping Stones location. In addition, the fence at the Circle of Love site did not enclose the playground and restrict children from getting into unsafe areas. These health and safety concerns were confirmed by the Center Managers and included in their Weekly Inspection List.

During the 2005 follow-up review it was revealed that the grantee still had not provided adequate maintenance and repairs to indoor and outdoor equipment and facilities. Observations at the Stepping Stones family day care home and Laverty center revealed equipment and facilities that were not maintained. The Health and Safety Checklist completed at the Stepping Stone site indicated that a bathroom sink/vanity had splintering wood on its sides. Aditionnally, the interior was damp and dirty due to the storage of wet towels and rugs in the vanity. This created mold and mildew (black spots with an odor) in the unit.

11

At the Laverty center, the review team observed a broken fence, protruding nails in the outdoor play area and unsafe supply cabinets above the classroom sinks. Specifically, the review team observed a broken wooden gate latch with a missing wood panel near the broken latch, and protruding nails in the railroad tires in the play area. In four classrooms, toxic cleaning supplies were stored in unlocked cabinets that were sink level and, therefore, easily accessible to children.

During the review, the health and safety concerns were shared with the Health Coordinator, Executive Director, the Director of Services and grantee review consultant. Also during the review, the grantee received a letter sent by facsimile and Federal Express from David Lett, ACF Regional Administrator, notifying the grantee that the Laverty center findings constituted a deficiency under 45 C.F.R. § 1304.39a)(6)(i)(A) requiring correction prior to the completion of the follow-up review. A site visit on the last day of the follow-up review confirmed that deficiency had been corrected.

For a detailed discussion of the findings related to this deficiency, please refer to page 29 of the 2005 Head Start Follow-up Review Report and page 18 of the 2004 Head Start Review Report.

## II. TERMINATION UNDER 45 C.F.R. § 1303.14(b)(4)

In accordance with 45 C.F.R. § 1303.14(b)(4), ACF may terminate a grantee's Head Start funding if the grantee "has failed to timely correct one or more deficiencies as defined in 45 C.F.R. Part 1304." As pertinent here, the Head Start regulations define a "deficiency" as:

> (i) An area or areas of performance in which an Early Head Start or Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one of the regulations under parts 1301, 1304, 1305, 1306 or 1308 of this Title and which involves:
>
> * * * *
>
> (C) A failure to perform substantially the requirements related to Early Childhood Development and Health Services...or Program Design and Management.

45 C.F.R. § 1304.3(a)(6)(i)(C). Although the grantee was advised of the requirement to correct within one year all deficiencies identified in the 2004 Head Start Review Report, the grantee failed to do so. Therefore, termination of Southern Delaware's grant under 45 C.F.R. § 1303.14(b)(4) is proper. In support of termination based on 45 C.F.R. § 1303.14(b)(4), ACF incorporates by reference all of the factual allegations set forth in Section I above as though set forth in their entirety in this paragraph.

12

### III. Termination Under 45 C.F.R. § 1303.14(b)(7)

In accordance with 45 C.F.R. § 1303.14(b)(7), termination of a grantee's funding is proper if the grantee has failed to comply with the requirements of the Head Start Act. Under the Head Start Act, a grantee that has been identified as having deficiencies must develop an approved QIP that specifies the deficiencies to be corrected, the actions to be taken to correct such deficiencies, and the timetable for accomplishment of corrective actions specified. Section 641A(d) of the Head Start Act, 42 U.S.C. § 9836a(d). Furthermore, under no circumstances can the grantee eliminate any such deficiencies later than one year after the date the agency received notice of the determination and of the specific deficiency to be corrected. Section 641A(d)(2)(A)(ii) of the Head Start Act, 42 U.S.C. § 9836a(d)(2)(A)(ii). Failure to correct such deficiencies requires ACF to terminate the grant. Section 641A(d)(1)(C) of the Head Start Act, 42 U.S.C. § 9836a(d)(1)(C). Notwithstanding Southern Delaware's approved QIP, seven deficiencies remained uncorrected beyond the Quality Improvement Period. What's more, all seven deficiencies remained uncorrected beyond one year from the date that the grantee received notice of the deficiencies identified and required to be corrected.

ACF incorporates by reference all of the factual allegations set forth in Section I above as though set forth in their entirety in this paragraph. By failing to correct seven deficiencies in accordance with its QIP, the grantee violated the Head Start Act. Section 641A(d) of the Head Start Act, 42 U.S.C. § 9836a(d). As a result, termination of Southern Delaware's grant under 45 C.F.R. § 1303.14(b)(7) is proper.

### IV. Termination Under 45 C.F.R. § 1303.14(b)(9)

Under the Head Start regulations, a deficiency that is not timely corrected shall be a material failure of a grantee to comply with the terms and conditions of its grant award. 45 C.F.R. § 1304.60(f). In support of termination based on 45 C.F.R. § 1303.14(b)(9), ACF incorporates by reference all of the factual allegations set forth in Section I above as though set forth in their entirety in this paragraph. When Southern Delaware failed to timely correct the seven deficiencies described in Section I, the result was a material failure of the grantee to comply with the terms and conditions of its grant award. In addition, the grantee has a history of failing to submit its Financial Status Report (SF-269) on time. ACF has yet to receive the SF-269 that was due July 30, 2005, for the period January 1, 2005 to June 30, 2005. The final SF-269 for the budget period that ended December 31, 2004 was due on January 30, 2005; however, it was not received until April 4, 2005. The grantee's failure to timely submit its SF-269 constitutes a failure by the grantee to abide by the terms and conditions of the grant award. Consequently, termination of Southern Delaware's grant under 45 C.F.R. § 1303.14(b)(9) is proper.

### V. Termination Under 45 C.F.R. § 1303.14(b)(3)

In accordance with 45 C.F.R. § 1303.14(b)(3), termination of a grantee's funding is proper if the grantee has failed to comply with the required fiscal reporting requirements applicable to grantees in the Head Start Program. As of this date, the grantee has yet to file the SF-269 that

13

was due by July 30, 2005. This is a violation of the reporting requirements found at 45 C.F.R. § 74.52(a)(1)(iv), and therefore termination under 45 C.F.R. § 1303.14(b)(3) is proper.

## APPEAL RIGHTS

If Southern Delaware wishes to appeal this termination, it must submit a written notification of appeal within 30 days of Southern Delaware's receipt of this letter. An appeal may be made only by the Board of Directors of Southern Delaware or an official acting with authority on behalf of the Board. Pursuant to 45 C.F.R. §§ 1304.60(f) and 1303.14(c), the appeal shall be governed by the regulations at 45 C.F.R Part 16, as modified by the Head Start regulations at Part 1303. If Southern Delaware requests a hearing, it shall be afforded one, as mandated by 42 U.S.C § 9841.

If this notice of termination fails to meet the requirements as set forth in 45 C.F.R § 1303.14(c), said failure may result in the dismissal of the termination notice without prejudice, or the remand of that action for the purpose of reissuing it with the necessary corrections.

If Southern Delaware wishes to appeal, its appeal must meet the requirements set forth in 45 C.F.R § 1303.14(d). An appeal must be in writing and must specifically identify what factual findings are disputed. The appeal must identify any legal issues raised, including relevant citations. The appeal must include an original and two copies of each document that Southern Delaware believes is relevant and supportive of its position. The appeal must include a statement on whether Southern Delaware is requesting a hearing. Also, if Southern Delaware is unable to obtain informally certain documents from ACF, the appeal must include any request for these specifically identified documents that Southern Delaware wishes to obtain, a statement of the relevance of the requested documents, and a statement that the grantee has attempted informally to obtain the documents from ACF and was unable to do so.

The grantee's appeal must be sent to:

> Department of Health and Human Services
> Departmental Appeals Board, MS 6127
> Appellate Division
> 330 Independence Ave., S.W.
> Cohen Building - Room G-644
> Washington, D.C. 20201

A copy of the appeal must also be sent to each of the following addresses:

> Joan H. Ohl, Commissioner
> Administration on Children, Youth, and Families
> P.O. Box 1182
> Washington, D.C. 20201

> and

14

David J. Lett, Regional Administrator
Administration for Children and Families
150 S. Independence Mall West, Suite 864
Philadelphia, PA 19106

We recommend that Southern Delaware use registered or certified mail return receipt requested to document the date of each submission.

Since Southern Delaware does not have a delegate agency, the requirements of 45 C.F.R. § 1303.14(c)(4) are inapplicable.

In accordance with 45 C.F.R § 1303.14(f)(1), during a grantee's appeal of a termination decision, funding will continue until an adverse decision is rendered or until the expiration of the then current budget period. At the end of the current budget period, if a decision has not been rendered, the responsible HHS official shall award an interim grant to the grantee until a decision is reached.

Enclosed are copies of Section 641A of the Head Start Act and 45 C.F.R Part 1303.
I am available to meet with you, the Board, and Executive Staff in the Philadelphia Regional Office to discuss the termination and closeout process. You can reach me at (215) 861-4000 to schedule a date and time.
If you have any questions, please do not hesitate to call Edward Vreeswyk, Head Start Program Manager, at (215) 861-4040.

Cordially,

Edw QR Vingt
FOR

David J. Lett
Regional Administrator
Administration for Children and Families

Enclosures:
    2005 Head Start Follow-up Review Report
    2004 Head Start Review Report
    Head Start Act Section 641A
    45 C.F.R Part 1303

cc:    Policy Council Chairperson
       Southern Delaware Executive Director